## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LISA SCARAMUZZO, individually and as a representative of a class of beneficiaries of the American Red Cross Savings Plan<br>　　　5000 Garner Drive<br>　　　Morrisville, PA 19067<br><br>　　　　　　　　　　　*Plaintiff*,<br><br>vs.<br><br>AMERICAN NATIONAL RED CROSS<br>　　　431 18th Street NW<br>　　　Washington, DC 20006;<br><br>BENEFIT PLAN COMMITTEE OF THE AMERICAN NATIONAL RED CROSS<br>　　　430 17th Street NW<br>　　　Washington, DC 20006; and<br><br>DOES 1-20,<br><br>　　　　　　　　　　　*Defendants*. | Case No. _____<br><br>Civil Action<br><br>**CLASS ACTION COMPLAINT**<br><br>Demand for Jury Trial |

## **COMPLAINT**

1.　　　Plaintiff Lisa Scaramuzzo, individually and as a representative of a class of participants in and beneficiaries of the American Red Cross Savings Plan (the "Plan"), brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (a)(3) on behalf of the Plan against defendants American National Red Cross ("Red Cross"), the Benefit Plan Committee of the American National Red Cross (the "Benefit Plan Committee"), and Does 1–20 (collectively "Defendants") for breach of fiduciary duties under the Employee Retirement Income Security Act ("ERISA").[1]

---

[1] ERISA is codified at 29 U.S.C. §§ 1001–1461.

2.      This case arises from Defendants' failure to control the recordkeeping, administrative, and other fees imposed on the Plan and passed on to all Plan participants, including Plaintiff.  By way of example, in 2019 Defendants caused the Plan to pay Alight Solutions, the Plan's recordkeeper, fees amounting to $188 per participant, which is four to five times higher than the amount that prudent fiduciaries of a 401(k) plan the size of the $1.2 billion Red Cross plan should permit.

3.      This case also arises from Defendants' imprudent selection and retention of poorly performing Northern Trust Focus Fund ("Focus Fund") target date investment funds in the Plan.  The performance of the Focus Funds was consistently materially worse than benchmark indexes and comparable target date funds, both before and after Defendants added them to the Plan lineup in 2017.  These target date funds were and are the default election if Red Cross employees did not specify other investment choices for their 401(k) contributions.  At the end of 2019, the Plan invested over $368 million in the Focus Funds, representing 30% of the Plan's $1.2 billion overall assets under management.

4.      As a result of Defendants' imprudent and disloyal actions and/or failures to act prudently and loyally, Plan participants have lost tens of millions of dollars in their investment accounts due to excessive fees and the underperforming Focus Funds.  Those losses will continue to compound over time because the Plan's reduced asset base will forego the benefit of compounded earnings.

5.      The marketplace for third party recordkeepers and other providers of administrative services is established and competitive with many entities available to provide services at reasonable rates for mega or jumbo 401(k) plans like the Plan.

6.      Similarly, the marketplace for retirement plan investment options, including target date funds, is established and competitive with many target date funds available that offer a proven performance history.

7.      Billion-dollar 401(k) plans like the Plan have tremendous bargaining power to obtain high-quality investment products that provide consistent, stable, and strong performance, and to obtain administrative services at a reasonable cost.

8.      As fiduciaries of the Plan, Defendants were and are obligated to act prudently, diligently, loyally, and for the benefit of all Plan participants in ensuring that, among other things, the Plan's investments are prudent and remain prudent investment options, and that the fees incurred by the Plan and passed on to its participants are not excessive.

9.      Defendants' fiduciary duties are the "highest known to the law" and must be discharged with an "eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).

10.      Instead of acting prudently, Defendants allowed the recordkeeping costs to spiral, and retained an underperforming suite of target date funds as core investment options in the Plan.

11.      The Plan's fees were excessive when compared to comparable 401(k) plans offered by other plan sponsors that had similar numbers of plan participants and similar levels of assets under management.  The excessive fees led to lower net returns than participants in comparable 401(k) plans enjoyed.

12.      The Focus Funds suffered from significant ongoing deficiencies resulting in material underperformance relative to well-established, prudently managed, comparable target date funds that were equally available to Defendants to be added as investment options in the Plan.  Given these deficiencies, a prudent fiduciary would have avoided adding the Focus Funds

to the Plan in 2017, and/or removed them thereafter and replaced them with prudent investment alternatives. Doing so would have avoided millions of dollars in losses suffered by Plan participants who invested in these underperforming funds.

13. To remedy these breaches of fiduciary duty, Plaintiff, individually and as a representative of a class of participants and beneficiaries of the Plan, brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (a)(3) to enforce Defendants' liability under 29 U.S.C. § 1109(a) to reimburse to the Plan all losses resulting from each breach of fiduciary duty.

## I.     JURISDICTION AND VENUE

14. <u>Subject-Matter Jurisdiction</u>. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under a federal statute, 29 U.S.C. § 1132(a)(2).

15. <u>Venue</u>. This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district where at least one of the alleged breaches of fiduciary duty took place and where the Red Cross is headquartered.

16. <u>Standing</u>. An action under 29 U.S.C. § 1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any breach of fiduciary duty and is the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any plan participant, fiduciary, or the U.S. Secretary of Labor to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2). As set forth below, the Plan suffered millions of dollars in losses resulting from Defendants' breaches of fiduciary duty, and those injuries may be redressed by a judgment in favor of Plaintiff on behalf of the Plan.

17.    To the extent Plaintiff must also show individual injuries even though 29 U.S.C. § 1132(a)(2) does not provide redress for individual injuries, Plaintiff has suffered such injuries because she was charged excessive fees, suffering economic harm in the form of lower investment returns.

## II.    PARTIES

### A.    Plaintiff

18.    Plaintiff Lisa Scaramuzzo, a resident of Pennsylvania, has been a participant in the Plan since 2013.  She is a participant in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

### B.    Defendants

#### 1.    American National Red Cross

19.    Defendant American National Red Cross is a nonprofit, tax-exempt, charitable organization headquartered in Washington, DC.  The Red Cross is the Plan Sponsor under 29 U.S.C. § 1002(16).[2]  The Red Cross is the employer of the Plan's other fiduciaries named as Defendants herein.

20.    The Red Cross acts as a "named fiduciary" and "administrator" of the Plan for purposes of 29 U.S.C. § 1102.

21.    The Red Cross exercises discretionary authority or control regarding management of the Plan, exercises authority or control regarding disposition of Plan assets, and/or has discretionary authority or responsibility in the administration of the Plan.  The Red Cross is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

---

[2]  *See* American Red Cross Savings Plan Form 5500 ("Form 5500") for the year ended December 31, 2019 at pg. 1.  Form 5500s are filed annually with the U.S. Department of Labor and are publicly available at https://www.efast.dol.gov/portal/app/disseminatePublic?execution=e1s1.

### 2.  The Benefit Plan Committee of the American National Red Cross

22.     The Benefit Plan Committee of the American National Red Cross is the Plan Administrator.[3]  The Benefit Plan Committee and its individual members are fiduciaries under 29 U.S.C. § 1102(a)(2).  The individual members of the Benefit Plan Committee, past and current, are not publicly identified by Defendants and are currently unknown to Plaintiff.

23.     The Benefit Plan Committee and its individual members exercise discretionary authority or control regarding management of the Plan, exercise authority or control regarding disposition of Plan assets, and/or have discretionary authority or responsibility in the administration of the Plan.  The Benefit Plan Committee and its members are fiduciaries under 29 U.S.C. § 1002(21)(A)(i) and (iii).

### 3.  Doe Defendants

24.     Plaintiff is currently unaware of the identities of the individuals, including but not limited to members of the Benefit Plan Committee, who exercised discretionary authority or control over the management of the Plan.  Those individuals are collectively included herein as Does 1−20.  When such individuals are identified, Plaintiff intends to substitute their names as individual defendants.

### 4.  Non-Party the American Red Cross Savings Plan

25.     The American Red Cross Savings Plan is a legal entity that can sue and be sued. 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

26.     The Plan is a defined contribution, individual account pension benefit plan under

---

[3]  *See* Summary Plan Description, Nov. 2020, at pg. 18.

29 U.S.C. § 1002(2)(A) and § 1002(34), in which employees of the Red Cross may participate.

27.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a)(1).  That document is not publicly available.

28.     Under the Plan, participants are responsible for investing in their individual accounts, and they will receive the market value of that account in retirement.  The account balance will depend on contributions made by each employee and/or the Red Cross (via matching contributions or otherwise), and on the performance of the chosen investments net of fees and expenses.

29.     Plan fiduciaries control what fees are paid by the Plan and what third party recordkeepers and other service providers are retained by the Plan.

30.     Plan fiduciaries also control what investment options are provided in the Plan and made available to employees.  Employees must choose from the limited number of investment options made available in the Plan.

31.     As of December 31, 2019, the Plan had $1,221,643,972 in investment assets under management.[4]  The Northern Trust Focus Funds comprised $368,268,940 of that total, or 30%.[5]  As of December 31, 2019, the Plan had 22,455 participants with account balances.[6]

## III.     ERISA FIDUCIARY STANDARDS

32.     ERISA imposes fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan.  Specifically, 29 U.S.C. § 1104(a) states:

> A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

---

[4] *See* American Red Cross Savings Plan Form 5500 for the year ended December 31, 2019, at Auditor's Report pg. 23.
[5] *Id.* at Auditor's Report pg. 12.
[6] *Id.* at pg. 2.

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

33.     Under ERISA, fiduciaries who exercise authority or control over plan assets, including but not limited to the selection and retention of plan investments and service providers, must act prudently and for the exclusive benefit of participants in the plan, and must monitor the funds in the plan and remove imprudent or excessively expensive funds.  *See* U.S. Dept. of Labor Advisory Opinions 97-15A and 97-16A; *see also* 29 U.S.C. § 1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

34.     Under ERISA, a "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).  Prudence requires a review at "regular intervals." *Id*.  When making investment decisions, an ERISA fiduciary is "duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property.'" *In re Unisys*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting Restatement (Second) of Trusts § 227 (1959)).  The duty to conduct an "independent investigation into the merits of a particular investment" is the "most basic of ERISA's investment fiduciary duties." *Id*. at 435.

35.     Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; Dept. of Labor

Advisory Opinions 98-04A and 88-16A. Fiduciaries have a "continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

36.      A fiduciary's process in performing these functions "must bear the marks of loyalty, skill, and diligence expected of an expert in the field." *Sweda v. Univ. of Penn et. al.*, 923 F.3d 320, 329 (3d Cir. 2019).

37.      ERISA also imposes co-fiduciary liabilities on plan fiduciaries. Specifically, 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary, or knowingly failing to cure a breach by another fiduciary:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>>
>> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>>
>> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

38.      Defendants have acknowledged their overall fiduciary duties, stating the following in the Summary Plan Description dated November 2020:

> ERISA . . . imposes obligations upon those persons responsible for the operation of the Savings Plan. Such persons are referred to as "fiduciaries" under the law. Fiduciaries must act solely in the interest of Savings Plan participants and beneficiaries, and they must act prudently in the performance of their Savings Plan duties. In the . . . event of violations of these rules, fiduciaries may be removed and required to make good any losses they have caused the Savings Plan.

## IV.  BACKGROUND FACTS

39.    The Plan is a "defined contribution plan."  Defined contribution plans dominate the landscape of retirement plans commonly used today.  In the private sector, such plans have largely replaced "defined benefit plans" that were often used in the past.

40.    According to the Investment Company Institute, Americans held $6.5 trillion in all employer-based defined contribution retirement plans as of September 30, 2020, of which $3.1 trillion was held in 401(k) plans.  *See* INVESTMENT COMPANY INSTITUTE, *Frequently Asked Questions About 401(k) Plan Research*.[7]

41.    A fundamental difference between defined benefit plans and defined contribution plans is that in defined benefit plans, the employer's assets are at risk.  Because the employer is responsible for funding the pension plan to satisfy predetermined commitments to employees, it bears all investment risk.  Conversely, in a defined contribution plan, the employees bear all investment risks because they are not guaranteed to receive a specific amount at retirement.  They receive the amount of their original contributions, plus or minus market fluctuations and minus fees charged during the periods of their investments.

42.    Because employers do not bear investment risk in defined contribution plans, they have less incentive to closely monitor fees and fund performance.  Thus, ERISA fiduciary duty obligations are an important tool to protect plan participants.

43.    Each participant in a defined contribution plan has an individual account, and they direct their monetary contributions into one or more investment alternatives from among a lineup of choices selected by the plan's fiduciaries.  The fiduciaries have exclusive control over the

---

[7] *Available at* https://www.ici.org/policy/retirement/plan/401k/faqs_401k (last visited Mar. 8, 2021).

suite of investments to which participants may direct the assets in their accounts, and the fees incurred by the Plan.

> **A.  Defendants Had a Duty to Reasonably Monitor and Control the Fees Incurred by the Plan and its Participants**

44.     Under 29 U.S.C. § 1104(a)(1)(C), a plan fiduciary must ensure that the costs of the investments are reasonable.  *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, Aug. 2013 ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

45.     This is because, as described by the Department of Labor, a one percent difference in fees and expenses can reduce a participant's retirement account balance by 28 percent over 35 years.  *Id*.

46.     Indeed, the Plan's Annual Fee Disclosure Statement dated February 2021 noted that "[f]ees and expenses are important because they can substantially reduce the growth of your account."

47.     The Department of Labor has explicitly stated that employers must "ensure that fees paid to service providers and other expenses of the plan are reasonable in light of the level and quality of services provided."  *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, Aug. 2013.

48.     The duty to evaluate and monitor fees includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio, or a percentage of assets under management within a particular investment.

49.     Plan fiduciaries have a responsibility to take into account the reasonableness of any expense ratio when selecting a mutual fund or any other investment option for the Plan.

50.     On average, lower expense ratios are available for 401(k) participants relative to expense ratios for other types of investors.  ERISA-mandated monitoring of investments has led plan sponsors to continually evaluate performance and fees, which has resulted in fierce competition among mutual funds in the marketplace.  Furthermore, the large average account balances of 401(k) plans, especially the largest plans with over $1 billion in assets managed (like the Plan here) has resulted in economies of scale and special pricing within mutual funds.

51.     This has led to falling mutual fund expense ratios for 401(k) plan participants since at least 2000.  These expense ratios have fallen 30% from 2000 to 2014 for equity funds, 24% for hybrid funds, and 28% for bond funds.[8]

52.     Large institutional investors such as the Plan are able to command lower-than-published pricing due to the size of their investments.  Often, they can receive custom funds, in the form of collective investment trusts, with the same or similar strategies as publicly available funds for the lowest-published price, or even a lower price simply because of the economies of scale that come with the ability to invest tens of millions of dollars in a single fund.

53.     Prudent and reasonable plan sponsors therefore should be monitoring both the performance and cost of the investments selected for their 401(k) plans, leveraging the size of their plan to ensure that well-performing, lower cost investment options are available to plan participants.

54.     Plan fiduciaries such as Defendants must be continually mindful of the performance and cost of plan investment options to avoid undue risk to plan participants' savings

---

[8] *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, ICI Research (Aug. 2015), at 1, *available at* https://www.ici.org/pdf/per21-03.pdf.

and to ensure that any fees paid are reasonable compensation for the services provided.  This includes fees paid to any service provider, as well as fees paid to the plan itself.

55.     Defendants must also be aware of the particular share class of the mutual fund available for investment to institutional and 401(k) plans, as certain shares can have lower fees than others.  A lower fee is usually predicated on a larger investment, *e.g*., the lower fee class of shares is only available to those who invest more money in the mutual fund.  Thus, for the same investment with the same manager, the fee can vary by 50 basis points or more between the highest-cost retail share class and the lowest-cost institutional share class.

56.     Plan fiduciaries must also be wary of conflicts of interest that arise when plan administrators and other fiduciaries select investment options for the plan that include a remittance of fees to the plan sponsor or another party affiliated with the plan sponsor.  The inherent conflict of interest in such situations can cause funds to be selected and retained when they are not the most prudent investment option and when they demonstrate poor performance.

### 1.    Defendants Breached their Fiduciary Duty to Minimize Recordkeeping and Administrative Expenses

57.     One of the responsibilities of plan fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts chap. 17, Intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("cost-conscious management is fundamental to prudence in the investment function").

58.     As the amount of assets under management approaches and exceeds $1 billion, economies of scale dictate that lower-cost administrative services will be available to these large plans.  Defendants were in a position to command highly competitive rates to secure third party

administrative services.  Nevertheless, Defendants allowed the Plan to incur significantly higher fees than those charged elsewhere for similarly sized plans in the marketplace.

59.    Third-party service providers, known as recordkeepers, provide recordkeeping and administrative ("R&A") services on behalf of defined contribution plans.

60.    R&A services are necessary for all defined contribution plans.  The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan.  Recordkeeping services typically include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, transaction processing, call center support, participant communications, and trust and custody services.

61.    The Plan disclosed that its "[f]ees paid to the recordkeeper . . . cover expenses for things like keeping data on participants, communication materials, Internet services, and assisting participants with transactions."[9]

62.    The market for defined contribution recordkeeping services is highly competitive, particularly for a plan with a large number of participants and high dollar amount of assets under management.

63.    Since at least the mid-2000s, the fees that R&A service providers have been willing to accept for providing recordkeeping and administrative services has decreased steadily.

64.    The underlying cost to a recordkeeper of providing R&A services to a defined contribution plan is primarily dependent on the number of participant accounts in the plan rather than the value of assets under management in the plan.

---

[9] *See* Annual Fee Disclosure Statement dated February 2021.

65.     Recordkeepers for larger defined contribution plans like the Plan experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increases.  This is because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low.  These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans.

66.     When the number of participants with an account balance increases in a defined contribution plan, the recordkeeper is able to spread the cost of providing recordkeeping services over a larger participant base, thereby reducing the unit cost of delivering services on a per-participant basis.

67.     A plan with more participants can and will receive a lower per-participant fee relative to a smaller plan.  This is well-known among retirement plan professionals, including R&A service providers and 401(k) administrators.

68.     Prudent plan fiduciaries ensure they are paying only reasonable fees for R&A services by soliciting competitive bids (*i.e.*, a request for proposal or "RFP") from other service providers to perform the same services being provided to the plan.  This is not a complex process and is performed regularly by prudent plan fiduciaries.  Fiduciaries commonly request periodic competitive bids from other service providers so they can determine if the current level of fees being charged for R&A services is reasonable.

69.     By going through a RFP process every few years, prudent plan fiduciaries can review the level of service provided by the current recordkeeper and compare the fees to those being offered by other reputable recordkeepers.  The bidding process can also give plan fiduciaries leverage to negotiate lower fees with their current R&A provider should they prefer to stay with their existing provider.

70.     In an asset-based pricing structure, the amount of compensation received by the service provider is based on the total assets in the Plan.  This structure creates situations in which the R&A services provided by the recordkeeper do not change but, because of market appreciation and additional contributions to the plan, the revenue received by the recordkeeper increases.  This structure is preferred by recordkeepers because it allows the recordkeeper to obtain an increase in fee revenue without having to ask the client to take affirmative steps to pay a higher fee.

71.     Regardless of the pricing structure negotiated by the plan fiduciary, the fiduciary must ensure that the fees paid for R&A services is reasonable for the level of services provided.

72.     Fiduciary best practices, based on Department of Labor guidelines and marketplace experience, are known (or should be known) to Defendants.  These practices include:

- Price administrative fees on a per-participant basis;

- Benchmark and negotiate recordkeeping and investment fees separately;

- Benchmark and negotiate recordkeeping and trustee fees at least every other year; and

- Review services annually to identify opportunities to reduce administrative costs.[10]

73.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's administrative costs.  *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (holding that 401(k) plan administrators breach their fiduciary duties when they "fail[] to monitor and control recordkeeping fees"); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800

---

[10] *See DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance,* Mercer Investment Consulting (2013), *available at* https://www.mercer.pt/content/dam/ mercer/attachments/global/Retirement/DC%20Fee%20Management%20-%20Mitigating% 20Fiduciary%20Risk%20and%20Maximizing%20Plan%20Performance.pdf.

(7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

74.    First, a plan fiduciary must pay close attention to the recordkeeping fees being paid by the plan relative to the services provided.  A prudent fiduciary closely tracks fee payment levels and the level of services being provided in exchange for the fees.

75.    Second, to make an informed evaluation as to whether a service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the service provider.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries must monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

76.    Third, a plan fiduciary must remain informed about overall trends in the marketplace regarding fees being paid by other plans, particularly comparably sized plans.  This will generally include conducting a bid process at reasonable intervals, particularly upon discovery that a plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  A bidding process should take place periodically as a matter of course, and more frequently if the plan experiences an increase in recordkeeping costs or if fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other similar plans.

77.    By simply soliciting bids from other providers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for similar R&A services and

arrive at a starting point for negotiations.  Accordingly, the most effective way to determine the true market price at any given time is to obtain competitive quotes through a bidding process. *See George*, 641 F.3d at 800 (7th Cir. 2011) (failure to solicit bids, and paying higher-than-market recordkeeping fees, supported triable breach of fiduciary duty claim).

78.    During the relevant period here, Defendants knew (or should have known) that they must regularly monitor the Plan's R&A fees.  Defendants knew (or should have known) that they must regularly solicit competitive bids from service providers in order to avoid paying objectively unreasonable fees for R&A services.  Notably, the Plan switched recordkeepers in 2016, transitioning from Hewitt Associates to Alight Solutions.  After doing so, the average per-participant R&A fee sharply *increased*, as noted in the chart below.  This strongly suggests that Defendants failed to conduct a proper bidding process at the time of the transition, or turned a blind eye to the resulting increase in fees after switching service providers.

79.    During the relevant period, Defendants failed to properly monitor and minimize the Plan's R&A fees.

80.    During the relevant period, Defendants knew or should have known it was in the best interests of the Plan's participants to ensure that the Plan paid no more than a competitive and reasonable fee for R&A services.

81.    During the relevant period, Defendants did not engage in objectively reasonable or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for R&A services.

82.    Because Defendants failed to properly monitor the Plan's R&A fees, the Plan's R&A fees were significantly higher than they would have been had Defendants engaged in a prudent process.

83.     The table below shows the Plan's annual R&A fees in the aggregate and on a per participant basis for the years 2015 through 2019 (the most recent year for which data is available).  The table illustrates that the Plan had on average 23,708 participants and paid R&A fees of approximately $3,737,216 per year on average, which equates to **$157.64 per participant**.  This amount is significantly higher than the industry average, as discussed below.

| Recordkeeping and Administration (R&A) Fees Paid to the Plan's Recordkeeper | | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **Average** |
| **R&A Fees[11]** | $2,600,405 | $2,616,174 | $5,087,750 | $4,153,032 | $4,228,721 | $3,737,216 |
| **Plan Participants[12]** | 25,136 | 23,689 | 24,133 | 23,127 | 22,455 | 23,708 |
| **Fees per Participant** | **$103.45** | **$110.44** | **$210.82** | **$179.57** | **$188.32** | **$157.64** |

84.     Based upon publicly available information available to Defendants at all relevant times, it was possible for the Plan to negotiate R&A fees much lower, in the range of $35 per participant.  The table below summarizes the R&A fees paid by plans of similar size and assets under management, and illustrates that the R&A fees paid by the Plan were significantly higher in comparison.

85.     As shown in the table below, for 2018, **the per-participant R&A fees paid by the Plan were $179, whereas the average per-participant R&A fees paid by peer funds was in the range of $35**.  Thus, the Plan's R&A fees were **five times higher than the comparison funds** in the sample.

---

[11]  Per Red Cross Form 5500s, Schedule C, service providers with service code "15" and/or "64," which signifies recordkeeping fees.
[12]  Per Red Cross Form 5500s.

| Comparable Plans' R&A Fees Paid to Recordkeepers in 2018[13] | | | | | |
|---|---|---|---|---|---|
| **Plan Name** | **Number of Participants** | **Assets Under Management** | **R&A Costs in Total** | **R&A Costs on Per Participant Basis** | **Recordkeeper** |
| **Red Cross Plan** | **23,127** | **$1,012,925,362** | **$4,153,032** | **$179** | **Alight Solutions** |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,603,610,831 | $472,673 | $35 | Fidelity |
| The Tax Sheltered Annuity Plan of Texas Children's Hospital | 13,950 | $993,649,270 | $416,395 | $30 | Fidelity |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity |
| Dollar General Corp. 401(k) Savings and Retirement Plan | 19,118 | $355,768,325 | $705,124 | $37 | Voya |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | $1,082,552 | $45 | T. Rowe Price |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $1,040,153 | $33 | Alight |
| Kindred 401(k) | 34,092 | $1,299,328,331 | $1,121,564 | $33 | T. Rowe Price |
| The Savings and Investment Plan [WPP Group] | 34,303 | $2,682,563,818 | $1,130,643 | $33 | Vanguard |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,104,524,321 | $1,298,775 | $27 | Vanguard |
| Sutter Health 403(B) Savings Plan | 73,408 | $3,681,162,013 | $1,908,133 | $26 | Fidelity |
| Google LLC 401(K) Savings Plan | 82,725 | $11,786,824,293 | $1,434,851 | $17 | Vanguard |
| Raytheon Savings and Investment Plan | 82,788 | $17,243,679,305 | $2,292,583 | $28 | Fidelity |

86.    This data illustrates that the Plan significantly overpaid for R&A costs.

---

[13] Price calculations are based on Form 5500 information filed by the respective plans for the year 2018.  R&A costs are based on Schedule C, service providers with service code "15" and/or "64," which signifies recordkeeping fees.

87.    The conclusions from the data above are consistent with conclusions reached by BrightScope, a leading 401(k) analyst and watchdog of 401(k) fees. According to BrightScope, the Plan is ranked as having much higher overall administrative costs relative to other plans with over $500 million in assets under management. BrightScope noted that "for the average 401k participant [in the Red Cross Plan], the 27 point difference between this plan's BrightScope Rating (66) and the top rated plan (93) could equate to: 18 additional years of work [and] $45,638 in lost savings."[14]

88.    Similarly, consulting group NEPC conducted its 2019 Defined Contribution Progress Report, which surveyed various defined contribution plan fees.[15] The sample size and respondents included 121 defined contribution plans allocated as follows: 71% Corporate, 20% Healthcare, and 9% Public, Not-for-Profit and other. The median plan had $512 million in assets under management and 5,440 participants. NEPC's survey found that the majority of plans with over 15,000 participants paid slightly more than $40 per participant in recordkeeping, trust, and custody fees. No plan with over 15,000 participants paid more than $70 per participant.[16] Again, the Plan's R&A fees were significantly higher than those figures.

89.    Another data source, the *401k Averages Book* (20th ed. 2020), studied plan fees for smaller plans, specifically those with under $200 million in assets. According to the analysis, a plan with $200 million in assets and 2,000 participants has an average recordkeeping and administration cost (through direct compensation) of $5 per participant. A plan with $20 million

---

[14] *See* https://www.brightscope.com/401k-rating/257115/American-National-Red-Cross/261254/The-American-Red-Cross-Savings-Plan/ (last visited March 3, 2021).
[15] *See* https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress%20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf (last visited March 3, 2021).
[16] *Id*. at 10.

in assets and 200 participants has an average recordkeeping and administration cost (through direct compensation) of $12 per participant. *Id*. at pp. 95, 108. The Plan's R&A costs greatly exceeded those averages.

90.     Had Defendants been acting in the exclusive best interest of the Plan, and employed a prudent process to gather comparative information to evaluate R&A fees, the Plan would have paid significantly less in fees.

91.     If Defendants would have secured more reasonable pricing for R&A services, they would have saved the Plan and class members millions of dollars per year. The savings would compound each year because they would lead to larger investment holdings in the Plan and larger gains on those investments over time.

92.     Defendants breached their fiduciary duties by allowing the Plan to overpay in R&A fees.

**B.      The Use of Target Date Funds in 401(k) Plans**

93.     Separately, Defendants caused the Plan to include in its offerings materially underperforming Northern Trust target date funds.

94.     Target date funds are designed to provide a single diversified investment vehicle for plan participants. Target date funds are offered as a suite of funds, with each fund based on the participant's anticipated retirement date.

95.     The first target date funds in the industry were offered as early as 1994, and since then the market of target date funds has exploded with numerous investment managers offering a variety of different target date fund investments.

96.     By the mid-2000s, many target date funds with established performance histories were available to defined contribution plans. By 2009, several target date funds had performance

22

histories of five years of more.

97.     Multiple types of assets are included in a target date fund portfolio, including equity (stock) and fixed income (bond) securities.  Target date funds offer diversity and balanced exposure to a broad array of underlying securities included in the fund.

98.     An investment in a single target date fund can be attractive to plan participants who do not want to actively manage their retirement savings and periodically convert to more conservative holdings as their retirement date draws near.  Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement.

99.     This rebalancing occurs based on the fund's "glide path."  A glide path determines how the fund's target asset allocations across the underlying securities are expected to change over time and how they become more conservative as the target retirement date approaches.

100.     For this reason, the "target date" refers to the participant's expected retirement year.  For example, "target date 2030" funds are designed for individuals who intend to retire in 2030.  As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative.

101.     Target date funds are commonly offered as mutual funds.  Mutual funds are pooled investment vehicles, which are registered investment companies under the Investment Company Act of 1940.  Mutual funds are offered to institutional and retail investors, and are commonly provided as an investment option within defined contribution plans.

102.     Target date funds are divided into two broad categories based on the fund's glide path: "To" and "Through" target date funds.  A "To" target date fund is designed to allocate its

underlying assets to the most conservative investments at the year of the expected retirement. In contrast, a "Through" target date fund utilizes a glidepath that continues its progression to its most conservative asset allocation past the expected retirement date. This method focuses on the life expectancy of the participant rather than the date of retirement.

103.    The Northern Trust Focus Funds are "Through" funds.

104.    Regardless of the type of target date fund, the development of a target date fund's glide path and the corresponding asset allocations are the most essential components of a target date fund. Constructing and maintaining a proper glide path and prudent asset allocation for target date funds is complex, time-consuming, and requires input from actuaries and other qualified investment professionals.

105.    Another broad classification of target date funds is whether the fund is actively or passively (or index) managed. With an active fund, the portfolio manager attempts to select stocks or bonds to generate investment returns that exceed the relevant benchmark index return. With a passive fund, the portfolio manager attempts to mimic the performance of a relevant benchmark index. No discretion or research is needed, in contrast to investing in actively managed funds. Because of this, passive or index funds charge a much lower investment management fee and have a lower total "expense ratio" relative to active funds.[17]

106.    For all target date funds, diversions from a determined glide path or significant changes in the underlying assets or asset allocations can have an extremely negative impact on wealth aggregation for investors. This impact can be particularly profound for participants in a

---

[17] The fees of mutual funds and similar investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points ("bps"). One basis point is equal to 1/100th of one percent.

401(k) plan. It is well known in the investment industry that 401(k) participants rarely make trades in their 401(k) plan account. A fiduciary, held to the standard of an investment professional, therefore must ensure that an investment option added to a 401(k) plan's suite of investments remains prudent and in the best interest of plan participants.

107.    A fiduciary's duty to ensure that a prudent target date fund is offered to plan participants is heightened when considering the circumstances in which these funds are used by participants. Given the structure of target date funds, participants are encouraged to invest all their retirement assets in a single target date fund that matches their retirement date. Some plans, like the Red Cross Plan, make target date funds the default selection if plan participants do not select a specific fund within the 401(k) plan's lineup of investments. Thus, the significance of a plan's target date fund options underscores the importance of a prudent and diligent process of monitoring all aspects of this critical investment for participants.

108.    A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. This process includes a requirement for the fiduciary to regularly evaluate the fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

109.    With respect to investment returns, a consistent performance history and investment strategy over a period of at least five years demonstrates the ability of the investment manager to generate sustained long-term investment results. Diligent investment professionals monitor the performance of their selected target date funds using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

110.    The measurement of target date funds against prudently managed alternatives is

critical given that these alternatives represent other target date funds available to the plan, which may be a more appropriate choice to meet participants' retirement needs.

111.    Given the construction and composition of target date funds, diligent investment professionals must perform ongoing analyses and monitoring to ensure that the selected target date funds remains prudent after their initial selection and insertion into the plan.  Diligent investment professionals not only assess the overall performance of the target date funds, but the underlying investments and allocations in the target date funds.  These are separately analyzed to assess any changes to those assets and to measure the performance of the underlying assets (*i.e.*, attribution analyses).

112.    During periods of underperformance, diligent investment professionals closely analyze the causes of the underperformance through attribution analyses.  Other causes or contributing factors are identified and analyzed, including the amount of turnover in the fund (*i.e.*, the amount of buying and selling of the fund's holdings) and the reasons behind unusually large percentages of turnover.

113.    Relatively high turnover ratios may reveal or indicate an investment manager's lack of experience in consistently managing a target date fund, or an attempt to correct underperformance by altering the composition of the underlying investments.  Any significant turnover in a fund (*e.g.*, more than 30%) warrants close analysis by investment professionals because it can suggest that the manager is not following a disciplined investment strategy.  Relatively high percentages of turnover also create increased transaction costs in the fund, which necessarily detract from performance.

114.    By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and

discrete changes to the underlying assets and allocations.  Established target date fund investment managers include Vanguard and American Funds, among others.

115.     Vanguard  and American Funds have each offered target date funds for nearly 20 years.  Those entities have provided stable target date investment returns to 401(k) plan participants.

### 1.     Defendants Breached Their Fiduciary Duties by Failing to Timely Remove the Consistently Underperforming Northern Trust Focus Funds

116.     At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's target date fund investment options.

117.     In 2009, Northern Trust Corporation launched a new suite of target date funds called the "Northern Trust Focus Funds."  The Focus Funds were comprised primarily of index or passive strategies in the various asset classes utilized.  Over time, the Focus Funds were offered by Northern Trust in various share classes.[18]

118.     In 2017, Defendants selected the Northern Trust Focus Funds for inclusion in the Red Cross Plan.  The Plan's Focus Fund balances were as follows as of December 31, 2017:[19]

| Northern Trust Focus Funds in Red Cross Plan | Plan Assets at Dec. 31, 2017 |
|---|---|
| ARC-NTAM Focus Target 2020 2231711 | $ 44,322,609 |
| ARC-NTAM Focus Target 2025 2231712 | $ 53,420,830 |
| ARC-NTAM Focus Target 2030 2231713 | $ 46,971,609 |
| ARC-NTAM Focus Target 2035 2231714 | $ 45,150,941 |
| ARC-NTAM Focus Target 2040 2231715 | $ 40,634,127 |
| ARC-NTAM Focus Target 2045 2231716 | $ 34,439,337 |

---

[18]  Mutual funds and collective investment trusts frequently offer multiple share classes.  The only difference between the share classes is fees.  Therefore, selecting higher-fee shares results in the plan paying wholly unnecessary fees with no underlying benefit in the performance of the shares.  Accordingly, absent a compelling reason to opt for the higher-fee share class, prudent fiduciaries will select the lowest-cost share class available to the plan.  Based on information publicly available at this time, the precise share class of the Focus Funds utilized in the Red Cross Plan is not currently known.

[19]  *See* Form 5500 for the year ended December 31, 2017, at Financial Statements pg. 12.

| | |
|---|---|
| ARC-NTAM Focus Target 2050 2231717 | $ 27,392,356 |
| ARC-NTAM Focus Target 2055 2231718 | $ 10,689,152 |
| ARC-NTAM Focus Target 2060 2231721 | $ 1,967,087 |
| **Total** | **$ 304,988,048** |

119.     The Focus Funds comprised 30.5% of the Fund's total assets under management

as of December 31, 2017.[20]

120.     The Focus Funds are the only target date retirement investing options in the Plan.

Participants in the Plan who want to invest in a target date strategy have no choices other than

the Focus Funds.

121.     The Plan's Focus Fund balances grew in the next two years and were as follows at

December 31, 2019, the most recent year for which fund balances are publicly available:[21]

| Northern Trust Focus Funds in Red Cross Plan | Plan Assets at Dec. 31, 2019 |
|---|---|
| ARC-NTAM Focus Target 2020 2231711 | $ 41,376,808 |
| ARC-NTAM Focus Target 2025 2231712 | $ 56,892,306 |
| ARC-NTAM Focus Target 2030 2231713 | $ 59,051,195 |
| ARC-NTAM Focus Target 2035 2231714 | $ 57,758,723 |
| ARC-NTAM Focus Target 2040 2231715 | $ 50,355,879 |
| ARC-NTAM Focus Target 2045 2231716 | $ 44,855,020 |
| ARC-NTAM Focus Target 2050 2231717 | $ 35,918,293 |
| ARC-NTAM Focus Target 2055 2231718 | $ 17,202,125 |
| ARC-NTAM Focus Target 2060 2231721 | $ 4,858,591 |
| **Total** | **$ 368,268,940** |

122.     The Focus Funds comprised 30% of the Fund's $1.2 billion total assets under

management as of December 31, 2019.[22]

123.     Defendants were under an obligation under ERISA to carefully vet the Focus

Funds before selecting them for inclusion in the Plan.  Defendants were also under a continuing

---

[20] *Id*. at Financial Statements pg. 12-24.

[21] *See* Form 5500 for the year ended December 31, 2019, at Financial Statements pg. 12.

[22] *Id*. at Financial Statements pg. 12-23.

obligation under ERISA to monitor and scrutinize the performance of the Focus Funds going forward.

124.    Both before and during the Focus Funds' inclusion in the Plan, the Focus Funds underperformed industry-accepted benchmarks for target date funds used by investment professionals.

125.    The Northern Trust Focus Funds can be compared to similar target date funds ("Comparator Funds") and target date indexes ("Comparator Indexes") as benchmarks.  Suitable comparators include the following:

   a.    **Vanguard Target Date Funds**.  Vanguard Target Date Funds pursue the same investment objectives as the Northern Trust Focus Funds, are managed by well-known investment advisers, and are available to all large retirement plans, including the Plan.  Morningstar has previously placed the Vanguard Target Date Funds in the same Morningstar Category as the Northern Trust Focus Funds, along with many other funds pursuing similar target date investment strategies.[23]

   b.    **American Funds Target Date Funds**.  Similarly, the American Funds Target Date Funds pursue the same investment objectives as the Northern Trust Focus Funds, are managed by well-known investment advisers, and are available to all large retirement plans, including the Plan.  Morningstar has previously placed the American

---

[23] A Morningstar Category is assigned by placing funds (*e.g.*, Northern Trust Focus Funds and Vanguard Target Date Funds) into peer groups based on their underlying holdings.  The underlying securities in each portfolio are the primary factor in Morningstar's analysis and proprietary classification methodology.  Funds are placed in a category based on their portfolio statistics and compositions over the past three years.  The Northern Trust Focus Funds are no longer included in the Morningstar Category for target date funds, but they were previously included during the relevant period.

Funds Target Date Funds in the same Morningstar Category as the Northern Trust Focus Funds.

        c.      **S&P Target Date Index**.  The S&P Target Date Index is a prominent and widely-accepted target date benchmark for "Through" target date funds.  The S&P Target Date Index is used as the primary benchmark for many target date funds throughout the industry.

        d.      **Dow Jones U.S. Target Date Index**.  The Dow Jones U.S. Target Date Index is another industry-accepted target date benchmark widely used by target date funds.  This index is commonly used for defined contribution retirement plans.

126.    A prudent fiduciary should have used these benchmarks, or substantially similar benchmarks, to evaluate the performance of the Northern Trust Focus Funds.

127.    The tables below demonstrate the underperformance of the Northern Trust Focus Funds relative to the Comparator Funds and Comparator Indexes from 2014 to 2020.  The data presented below was available to Defendants throughout the relevant period in real-time.

128.    Table 1 below illustrates the underperformance of the Northern Trust Focus 2015

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2015 Inv.[24] | 6.56% | -0.46% | 6.16% | 11.50% | -2.97% | 14.81% | 10.32% |
| American Funds 2015 Target Date Retirement Fund[25] | 6.64% | -0.62% | 7.55% | 11.19% | -2.72% | 14.94% | 9.96% |
| S&P Target Date 2015 Index[26] | 5.49% | -0.16% | 6.56% | 11.39% | -3.67% | 15.40% | 10.28% |
| Dow Jones U.S. Target 2015 Index[27] | 7.40% | 0.28% | 5.20% | 6.87% | -1.12% | 12.10% | 8.05% |
| **Average of All Comparators Above** | 6.52% | -0.24% | 6.37% | 10.24% | -2.62% | 14.31% | 9.65% |
| **Northern Trust Focus 2015 Fund[28]** | **4.69%** | **-0.87%** | **5.46%** | **9.74%** | **-3.21%** | **14.58%** | **Unavail.** |

129.    Table 2 below illustrates the underperformance of the Northern Trust Focus 2020

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2020 Inv.[29] | 7.11% | -0.68% | 6.95% | 14.08% | -4.24% | 17.63% | 12.04% |
| American Funds 2020 Target Date Retirement Fund[30] | 6.74% | 0.19% | 7.05% | 12.87% | -2.69% | 15.59% | 10.99% |
| S&P Target Date 2020 Index[31] | 5.67% | -0.19% | 7.22% | 12.80% | -4.16% | 16.52% | 10.24% |
| Dow Jones U.S. Target 2020 Index[32] | 8.00% | 0.27% | 6.28% | 8.46% | -1.42% | 13.89% | 8.82% |
| **Average of All Comparators Above** | 6.88% | -0.10% | 6.88% | 12.05% | -3.13% | 15.91% | 10.52% |
| **Northern Trust Focus 2020 Fund[33]** | **4.46%** | **-1.27%** | **5.76%** | **10.71%** | **-3.64%** | **15.05%** | **10.78%** |

---

[24] *See* https://www.morningstar.com/funds/xnas/vtxvx/quote (last visited Feb. 3, 2021).

[25] *See* https://www.morningstar.com/funds/xnas/rfjtx/quote (last visited Feb. 3, 2021).

[26] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2015-index/#overview (last visited Feb. 3, 2021).

[27] Data obtained from Bloomberg.

[28] *See Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill.), Class Action Complaint, *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.

[29] *See* https://www.morningstar.com/funds/xnas/vtwnx/quote (last visited Feb. 3, 2021).

[30] *See* https://www.morningstar.com/funds/xnas/rrctx/quote (last visited Feb. 3, 2021).

[31] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2020-index/#overview (last visited Feb. 3, 2021).

[32] Data obtained from Bloomberg.

[33] *See Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill.), Class Action Complaint, *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.  Data for 2020 was obtained from the Red Cross Annual Fee Disclosure Statement dated Feb. 2021.

130.    Table 3 below illustrates the underperformance of the Northern Trust Focus 2025

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2025 Inv.[34] | 7.17% | -0.85% | 7.48% | 15.94% | -5.15% | 19.63% | 13.30% |
| American Funds 2025 Target Date Retirement Fund[35] | 6.66% | 0.13% | 7.36% | 15.33% | -3.47% | 17.85% | 13.67% |
| S&P Target Date 2025 Index[36] | 5.56% | -0.25% | 7.82% | 14.55% | -5.02% | 18.38% | 11.22% |
| Dow Jones U.S. Target 2025 Index[37] | 8.69% | 0.20% | 7.77% | 10.53% | -2.30% | 16.38% | 10.04% |
| **Average of All Comparators Above** | 7.02% | -0.19% | 7.61% | 14.09% | -3.99% | 18.06% | 12.06% |
| **Northern Trust Focus 2025 Fund[38]** | **4.18%** | **-1.66%** | **6.31%** | **12.42%** | **-4.35%** | **16.85%** | **11.57%** |

131.    Table 4 below illustrates the underperformance of the Northern Trust Focus 2030

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2030 Inv.[39] | 7.17% | -1.03% | 7.85% | 17.52% | -5.86% | 21.07% | 14.10% |
| American Funds 2030 Target Date Retirement Fund[40] | 7.06% | 0.47% | 7.71% | 18.40% | -4.16% | 20.06% | 15.16% |
| S&P Target Date 2030 Index[41] | 5.64% | -0.30% | 8.35% | 16.19% | -5.99% | 20.38% | 11.91% |
| Dow Jones U.S. Target 2030 Index[42] | 9.35% | -0.15% | 9.12% | 12.67% | -3.29% | 19.18% | 11.49% |
| **Average of All Comparators Above** | 7.31% | -0.25% | 8.26% | 16.20% | -4.83% | 20.17% | 13.17% |
| **Northern Trust Focus 2030 Fund[43]** | **3.90%** | **-2.09%** | **7.31%** | **15.67%** | **-5.73%** | **19.40%** | **12.13%** |

[34] *See* https://www.morningstar.com/funds/xnas/vttvx/quote (last visited Feb. 3, 2021).

[35] *See* https://www.morningstar.com/funds/xnas/rfdtx/quote (last visited Feb. 3, 2021).

[36] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2025-index/#overview (last visited Feb. 3, 2021).

[37] Data obtained from Bloomberg.

[38] *See Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill.), Class Action Complaint, *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.  Data for 2020 was obtained from the Red Cross Annual Fee Disclosure Statement dated Feb. 2021.

[39] *See* https://www.morningstar.com/funds/xnas/vthrx/quote (last visited Feb. 3, 2021).

[40] *See* https://www.morningstar.com/funds/xnas/rfetx/quote (last visited Feb. 3, 2021).

[41] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2030-index/#overview (last visited Feb. 3, 2021).

[42] Data obtained from Bloomberg.

[43] *See Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill.), Class Action Complaint, *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.  Data for 2020 was obtained from the Red Cross Annual Fee Disclosure Statement dated Feb. 2021.

132.    Table 5 below illustrates the underperformance of the Northern Trust Focus 2035

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|------|
| Vanguard Target Retirement 2035 Inv.[44] | 7.24% | -1.26% | 8.26% | 19.12% | -6.58% | 22.44% | 14.79% |
| American Funds 2035 Target Date Retirement Fund[45] | 7.02% | 0.59% | 8.00% | 21.04% | -5.14% | 23.29% | 17.55% |
| S&P Target Date 2035 Index[46] | 5.69% | -0.35% | 8.85% | 17.78% | -6.88% | 22.18% | 12.79% |
| Dow Jones U.S. Target 2035 Index[47] | 9.92% | -0.45% | 10.36% | 14.71% | -4.31% | 22.02% | 12.96% |
| **Average of All Comparators Above** | 7.47% | -0.37% | 8.87% | 18.16% | -5.73% | 22.48% | 14.52% |
| **Northern Trust Focus 2035 Fund[48]** | **3.60%** | **-2.50%** | **8.30%** | **18.95%** | **-7.43%** | **16.16%** | **11.83%** |

133.    Table 6 below illustrates the underperformance of the Northern Trust Focus 2040

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|------|
| Vanguard Target Retirement 2040 Inv.[49] | 7.15% | -1.59% | 8.73% | 20.71% | -7.32% | 23.86% | 15.47% |
| American Funds 2040 Target Date Retirement Fund[50] | 6.96% | 0.58% | 8.17% | 21.98% | -5.52% | 24.40% | 18.77% |
| S&P Target Date 2040 Index[51] | 5.69% | -0.40% | 9.23% | 18.87% | -7.41% | 23.37% | 13.37% |
| Dow Jones U.S. Target 2040 Index[52] | 10.35% | -0.70% | 11.37% | 16.45% | -5.24% | 24.58% | 14.30% |
| **Average of All Comparators Above** | 7.54% | -0.53% | 9.38% | 19.50% | -6.37% | 24.05% | 15.48% |
| **Northern Trust Focus 2040 Fund[53]** | **3.35%** | **-2.96%** | **8.59%** | **19.95%** | **-8.20%** | **23.84%** | **11.98%** |

[44] *See* https://www.morningstar.com/funds/xnas/vtthx/quote (last visited Feb. 3, 2021).

[45] *See* https://www.morningstar.com/funds/xnas/reftx/quote (last visited Feb. 3, 2021).

[46] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2035-index/#overview (last visited Feb. 3, 2021).

[47] Data obtained from Bloomberg.

[48] *See Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill.), Class Action Complaint, *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.  Data for 2020 was obtained from the Red Cross Annual Fee Disclosure Statement dated Feb. 2021.

[49] *See* https://www.morningstar.com/funds/xnas/vforx/quote (last visited Feb. 3, 2021).

[50] *See* https://www.morningstar.com/funds/xnas/rfgtx/quote (last visited Feb. 3, 2021).

[51] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2040-index/#overview (last visited Feb. 3, 2021).

[52] Data obtained from Bloomberg.

[53] *See Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill.), Class Action Complaint, *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.  Data for 2020 was obtained from the Red Cross Annual Fee Disclosure Statement dated Feb. 2021.

134.    Table 7 below illustrates the underperformance of the Northern Trust Focus 2045

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2045 Inv.[54] | 7.16% | -1.57% | 8.87% | 21.42% | -7.90% | 24.94% | 16.30% |
| American Funds 2045 Target Date Retirement Fund[55] | 7.09% | 0.64% | 8.27% | 22.44% | -5.58% | 24.68% | 19.21% |
| S&P Target Date 2045 Index[56] | 5.67% | -0.46% | 9.54% | 19.56% | -7.74% | 24.02% | 13.66% |
| Dow Jones U.S. Target 2045 Index[57] | 10.61% | -0.87% | 12.06% | 17.67% | -5.97% | 26.49% | 15.34% |
| **Average of All Comparators Above** | 7.63% | -0.57% | 9.69% | 20.27% | -6.80% | 25.03% | 16.13% |
| **Northern Trust Focus 2045 Fund[58]** | **3.35%** | **-2.95%** | **8.57%** | **19.79%** | **-8.13%** | **23.73%** | **12.02%** |

135.    Table 8 below illustrates the underperformance of the Northern Trust Focus 2050

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2050 Inv.[59] | 7.18% | -1.58% | 8.85% | 21.39% | -7.90% | 24.98% | 16.39% |
| American Funds 2050 Target Date Retirement Fund[60] | 7.02% | 0.65% | 8.33% | 22.61% | -5.61% | 25.04% | 19.42% |
| S&P Target Date 2050 Index[61] | 5.69% | -0.47% | 9.74% | 20.18% | -7.94% | 24.35% | 13.86% |
| Dow Jones U.S. Target 2050 Index[62] | 10.67% | -0.92% | 12.36% | 18.26% | -6.40% | 27.57% | 16.04% |
| **Average of All Comparators Above** | 7.64% | -0.58% | 9.82% | 20.61% | -6.96% | 25.49% | 16.43% |
| **Northern Trust Focus 2050 Fund[63]** | **3.34%** | **-2.96%** | **8.55%** | **19.61%** | **-8.03%** | **23.57%** | **11.92%** |

---

[54] *See* https://www.morningstar.com/funds/xnas/vtivx/quote (last visited Feb. 3, 2021).

[55] *See* https://www.morningstar.com/funds/xnas/rfhtx/quote (last visited Feb. 3, 2021).

[56] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2045-index/#overview (last visited Feb. 3, 2021).

[57] Data obtained from Bloomberg.

[58] *See Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill.), Class Action Complaint, *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.  Data for 2020 was obtained from the Red Cross Annual Fee Disclosure Statement dated Feb. 2021.

[59] *See* https://www.morningstar.com/funds/xnas/vfifx/quote (last visited Feb. 3, 2021).

[60] *See* https://www.morningstar.com/funds/xnas/rfitx/quote (last visited Feb. 3, 2021).

[61] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2050-index/#overview (last visited Feb. 3, 2021).

[62] Data obtained from Bloomberg.

[63] *See Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill.), Class Action Complaint, *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20

136.    Table 9 below illustrates the underperformance of the Northern Trust Focus 2055 Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2055 Inv.[64] | 7.19% | -1.72% | 8.88% | 21.38% | -7.89% | 24.98% | 16.32% |
| American Funds 2055 Target Date Retirement Fund[65] | 7.01% | 0.63% | 8.30% | 22.63% | -5.65% | 25.09% | 19.39% |
| S&P Target Date 2055 Index[66] | 5.64% | -0.54% | 9.94% | 20.48% | -7.97% | 24.48% | 13.86% |
| Dow Jones U.S. Target 2055 Index[67] | 10.67% | -0.92% | 12.37% | 18.30% | -6.49% | 27.80% | 16.32% |
| **Average of All Comparators Above** | 7.63% | -0.64% | 9.87% | 20.70% | -7.00% | 25.59% | 16.47% |
| **Northern Trust Focus 2055 Fund[68]** | **3.30%** | **-2.92%** | **8.53%** | **19.42%** | **-7.97%** | **23.43%** | **11.98%** |

137.    As the charts illustrate, the underperformance of the Northern Trust target date funds continued year after year.  Starting at least as early as 2014, all of the Focus Funds consistently underperformed.

138.    Despite the Focus Funds being passively managed as index funds designed to meet or exceed industry-recognized benchmarks, these funds were underperformers.  The persistent underperformance should have prompted a meaningful analysis by Defendants as to the cause of the underperformance and ways to address it by switching to other available target date funds.

139.    The underperformance of the Focus Funds caused the Plan to sustain substantial losses.

---

Fund%20Suit.pdf.  Data for 2020 was obtained from the Red Cross Annual Fee Disclosure Statement dated Feb. 2021.

[64] *See* https://www.morningstar.com/funds/xnas/vffvx/quote (last visited Feb. 3, 2021).

[65] *See* https://www.morningstar.com/funds/xnas/rfktx/quote (last visited Feb. 3, 2021).

[66] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2055-index/#overview (last visited Feb. 3, 2021).

[67] Data obtained from Bloomberg.

[68] *See Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill.), Class Action Complaint, *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.  Data for 2020 was obtained from the Red Cross Annual Fee Disclosure Statement dated Feb. 2021.

140.    In light of the material underperformance, Defendants should have performed research and due diligence to determine whether the Focus Funds remained a prudent investment alternative.  An in-depth review would have revealed that the Focus Funds were an unjustified investment and should have been replaced.

141.    The sustained underperformance would have caused diligent investment professionals to commence a process designed to consider alternative target date funds to replace the Focus Funds.  An analysis of alternative target date funds, including either passive or active "Through" target date funds, would have revealed that superior alternative funds were available with experienced target date fund managers and superior performance.

142.    Despite the above, Defendants kept the Focus Funds in the Plan from 2017 to the present.  In violation of Defendants' fiduciary obligations, the Focus Funds remained in the Plan and continued to underperform prudent alternatives, causing substantial losses to the Plan and the participants who invested in the Focus Funds.

143.    In adding the Focus Funds to the Fund and failing to replace those funds thereafter despite persistent underperformance, Defendants failed to "balance the relevant factors and make a reasoned decision as to the preferred course of action – under circumstances in which a prudent fiduciary would have done so."  *George v. Kraft Foods Global, Inc*., 641 F.3d 786, 788 (7th Cir. 2011).  With the information available to Defendants, there was no prudent reason to retain the Focus Funds in the Plan year after year.

144.    The historically consistent and strong performance of well-established target date funds offered by other entities would have caused a prudent fiduciary to replace the Focus Funds.

145.    By failing to act as prudent and diligent investment professionals, Defendants caused Plan participants to lose substantial retirement assets.

## V.     CLASS ACTION ALLEGATIONS

146.    Pursuant to 29 U.S.C. § 1132(a)(2), any participant or beneficiary of the Plan may bring an action individually on behalf of the Plan to enforce a fiduciary's liability pursuant to 29 U.S.C. § 1109(a).

147.    In acting in this representative capacity, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

148.    Plaintiff seeks to certify, and to be appointed as a representative of, the following classes (collectively the "Class"):

> Excessive Fees Class: All persons who were participants in or beneficiaries of the American Red Cross Savings Plan at any time from March 8, 2015 through the date of judgment.

> Northern Trust Focus Funds Class: All participants in or beneficiaries of the American Red Cross Savings Plan who invested in any of the Northern Trust Focus Fund target date funds from January 1, 2017 through the date of judgment.

149.    Defendants and any of their executive officers are excluded from the Class.

150.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons.

151.    Numerosity: The Class includes over 20,000 members and is so large that joinder of all its members is impracticable.

152.    Commonality: There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries, and took the actions alleged herein as to the Plan and not as to any individual participant.  Common questions of law and fact include the following, without limitation:

a.      whether the fiduciaries of the Plan breached their fiduciary duties to the Plan;

b.      which fiduciaries are liable for the remedies provided by 29 U.S.C. § 1109(a);

c.      what losses to the Plan resulted from each breach of fiduciary duty; and

d.      what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches of fiduciary duty.

153.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Class because Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

154.    <u>Adequacy of Representation</u>: Plaintiff is an adequate representative of the Class because she was a participant in the Plan during the relevant period; suffered losses from Defendants' breaches of fiduciary duty; has no interest that is in conflict with any other member of the Class; is committed to the vigorous representation of the Class; and has engaged experienced and competent counsel to represent the Class.

155.    Prosecution of separate actions by individual participants would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a).  Also, individual non-class adjudications by participants regarding Defendants' breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of participants not parties to those individual adjudications or would substantially impair or impede those participants' ability to protect their interests.  For these reasons, among others, this action should be certified as a class action pursuant to Rule 23(b)(1)(A) or (B).

156.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all individual participants is impracticable; the losses suffered by

individual participants may be small and impracticable for individual members to enforce their rights through individual actions; and the common questions of law and fact predominate over and individual questions.  Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.  As a result, this action may be certified as a class action under Fed. R. Civ. P. 23(b)(3) if it is not certified under Fed. R. Civ. P. 23(b)(1)(A) or (B).

157.    Plaintiff's counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g).  Plaintiff's counsel have been appointed as class counsel in many previous ERISA class actions.

**COUNT I**
**BREACH OF FIDUCIARY DUTY (29 U.S.C. § 1104)**
**REGARDING EXCESSIVE FEES**
**(Brought Against All Defendants)**

158.    Plaintiff restates and incorporates all allegations in the preceding paragraphs as if fully set forth herein.

159.    At all relevant times herein, Defendants were fiduciaries of the Plan within the meaning of 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

160.    As fiduciaries of the Plan, Defendants were subject to the fiduciary duties imposed by 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

161.    Defendants breached their fiduciary duties because they did not make decisions regarding the Plan's administrative fees based solely on what was in the best interest of the

Plan's participants.  Defendants failed to investigate the availability of lower-cost administrative services for the Plan.

162.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them in their retirement accounts.

163.    Total Plan losses will be determined after discovery and analysis by expert witnesses.

164.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  Plaintiff is also entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth herein.

165.    Defendants knowingly participated in each breach of fiduciary duty by other Defendants, knowing that such acts were a breach.  Defendants enabled the other Defendants to commit breaches of fiduciary duty by failing to lawfully discharge their own duties.  Defendants knew of the breaches of fiduciary duty by the other Defendants and failed to make any reasonable and timely effort to cease or remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries pursuant to 29 U.S.C. § 1105(a).

## COUNT II
### FAILURE TO MONITOR FIDUCIARIES
### REGARDING EXCESSIVE FEES
**(Brought Against Defendants American National Red Cross and the
Benefit Plan Committee of the American National Red Cross)**

166.    Plaintiff restates and incorporates all allegations in the preceding paragraphs as if fully set forth herein.

167.    This Count is asserted against Defendants Red Cross and the Benefit Plan Committee.

168.    Defendant Red Cross is authorized to appoint members of the Benefit Plan Committee and its Doe members and, therefore, had a duty to monitor the performance of those appointees regarding the fulfillment of their fiduciary duties.  Each Benefit Plan Committee member and fiduciary likewise had a duty to monitor the performance of each other member of the Benefit Plan Committee and had a responsibility to monitor each individual to whom it delegated any fiduciary responsibilities.

169.    Under ERISA, a monitoring fiduciary must ensure that the persons to whom it delegates fiduciary duties are properly performing their fiduciary obligations, including with respect to the servicing of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge their duties.

170.    To the extent any of the fiduciary responsibilities of Defendants Red Cross and/or the Benefit Plan Committee were delegated to another fiduciary, their monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

171.    Defendants Red Cross and/or the Benefit Plan Committee breached their fiduciary monitoring duties by, among other things:

a.      failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered material losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

b.      failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the breach because of the unreasonable fees incurred in violation of ERISA;

c.      failing to ensure that the monitored fiduciaries considered the availability of comparable service providers that charged significantly lower fees and expenses than the Plan's service providers; and

d.      failing to remove appointees whose performance was inadequate in that they continued to allow unreasonable fees to be charged to the Plan, all to the detriment of Plan participants' retirement savings.

172.    As a direct result of these breaches of fiduciary duty to monitor, the Plan suffered substantial losses.  Had Defendants Red Cross and the Benefit Plan Committee discharged their monitoring duties prudently, the Plan would not have suffered these losses.

173.    Total Plan losses will be determined after discovery and analysis by expert witnesses.

## COUNT III
### BREACH OF FIDUCIARY DUTY (29 U.S.C. § 1104)
### REGARDING THE UNDERPERFORMING NORTHERN TRUST FOCUS FUNDS
#### (Brought Against All Defendants)

174.    Plaintiff restates and incorporates all allegations in the preceding paragraphs as if fully set forth herein.

175.    This Count alleges breach of fiduciary duties against all Defendants.

176.    Defendants are required to manage the assets of the Plan with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

177.    Defendants are directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis, eliminating imprudent investment options, and taking necessary steps to ensure that the Plan's assets continue to be invested prudently.  As the Supreme Court confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1829.

178.    In carrying out these responsibilities, Defendants were required to act in a manner consistent with an investment professional in similar circumstances.

179.    Despite these high duties, Defendants breached their duties of prudence under 29 U.S.C. § 1104(a)(1)(B) by selecting and continuing to retain the Northern Trust Focus Funds, which consistently underperformed and suffered from a variety of ongoing deficiencies.

180.    Defendants failed to engage in reasoned decision-making in concluding that the Focus Funds were prudent investments to be included in the Plan.  Defendants failed to engage in a reasoned and diligent process in considering whether participants would be better served by other target date funds available to the Plan after considering all relevant factors.  Defendants' decision to select the Focus Funds for inclusion in the Plan in 2017 and continue to retain them thereafter caused the Plan and participants to incur significant performance losses.

181.    Total Plan losses will be determined after discovery and analysis by expert witnesses.

182.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to reimburse the Plan for any losses resulting from the breaches of fiduciary duties alleged herein.  Each Defendant is also subject to other equitable or remedial relief as appropriate.

183.    Each Defendant participated in the breaches of fiduciary duty by the other Defendants knowing that such acts were breaches.  Each Defendant enabled the other Defendants to commit breaches of fiduciary duty by failing to lawfully discharge their own fiduciary duties.  Each Defendant knew of the breaches of fiduciary duty by the other Defendants, and failed to make any reasonable effort under the circumstances to cease or remedy the breaches.  Thus, each Defendant is liable for losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT IV
### FAILURE TO MONITOR FIDUCIARIES
### REGARDING THE UNDERPERFORMING NORTHERN TRUST FOCUS FUNDS
**(Brought Against Defendants American National Red Cross and the
Benefit Plan Committee of the American National Red Cross)**

184.    Plaintiff restates and incorporates all allegations in the preceding paragraphs as if fully set forth herein.

185.    This Count is asserted against Defendants Red Cross and the Benefit Plan Committee.

186.    Defendant Red Cross is authorized to appoint members of the Benefit Plan Committee and its Doe members and, therefore, had a duty to monitor the performance of those appointees regarding the fulfillment of their fiduciary duties.  Each Benefit Plan Committee member and fiduciary likewise had a duty to monitor the performance of each other member of the Benefit Plan Committee and had a responsibility to monitor each individual or entity to whom it delegated any fiduciary responsibilities.

187.    Under ERISA, a monitoring fiduciary must ensure that the persons to whom it delegates fiduciary duties are performing their fiduciary obligations, including with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge their duties.

188.    To the extent any of the fiduciary responsibilities of Defendants Red Cross and/or the Benefit Plan Committee were delegated to another fiduciary, the monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

189.    Defendants Red Cross and/or the Benefit Plan Committee breached their fiduciary monitoring duties by, among other things:

    a.    failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered material losses as a result of their appointees' imprudent actions with respect to the Plan;

    b.    failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the breach of fiduciary duties in violation of ERISA;

    c.    failing to ensure that the monitored fiduciaries considered the availability of comparable and better performing target date funds for the Plan; and

    d.    failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options to be retained in the Plan, all to the detriment of Plan participants' retirement savings.

190.    As a direct result of these breaches of fiduciary duty to monitor, the Plan suffered substantial losses.  Had Defendants Red Cross and the Benefit Plan Committee discharged their

fiduciary monitoring duties prudently as described above, the Plan would not have suffered these losses.

191.    Total Plan losses will be determined after discovery and analysis by expert witnesses.

## JURY TRIAL DEMANDED

192.    Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

a.      find and declare that Defendants have breached their fiduciary duties as described above;

b.      find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

c.      determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

d.      order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under § 1109(a);

e.      remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

      f.     surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, or otherwise in violation of ERISA;

      g.     reform the Plan to include only prudent investments;

      h.     certify the Class, appoint Plaintiff as the class representative, and appoint Berger Montague PC and Edelson Lechtzin LLP as Class Counsel;

      i.     award to Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

      j.     order the payment of interest to the extent allowed by law; and

      k.     grant other equitable or remedial relief as the Court deems appropriate.

March 8, 2021                         Respectfully submitted,

                            /s/  Daniel J. Walker

                          Daniel J. Walker (DC Bar No. 219439)
                          **BERGER MONTAGUE PC**
                          2001 Pennsylvania Ave., NW, Suite 300
                          Washington, DC 20006
                          Tel: (202) 559-9745
                          Email: dwalker@bm.net

                          Todd Collins
                          Jon Lambiras
                          **BERGER MONTAGUE PC**
                          1818 Market St., Suite 3600
                          Philadelphia, PA 19103
                          Tel: (215) 875-3000
                          Email: tcollins@bm.net
                          Email: jlambiras@bm.net

                          Eric Lechtzin
                          **EDELSON LECHTZIN LLP**
                          3 Terry Drive, Suite 205
                          Newtown, PA 18940
                          Tel: (215) 867-2399

Email: elechtzin@edelson-law.com

*Counsel for Plaintiff and the Class*